**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SG COWEN & CO., LLC, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-11106 PBS |
| ) | |
| TWIN CITY FIRE INSURANCE COMPANY, ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF SG COWEN & CO., LLC'S MOTION FOR LEAVE TO FILE A**
**SECOND SUPPLEMENTAL DECLARATION OF GERALD A. NOVACK, ESQ.**

Plaintiff SG Cowen & Co., LLC ("SG Cowen") respectfully moves this Court for leave to

submit the Second Supplemental Declaration of Gerald A. Novack, Esq., which is attached

hereto as an exhibit.  In support of this Motion, SG Cowen states that such Supplemental

Declaration is necessary to bring to the Court's attention significant events that transpired

yesterday, November 28, 2005.  First, Christopher Butler, a representative of the Defendant, was

deposed yesterday; during his sworn testimony, Mr. Butler admitted, as SG Cowen predicted,

that the Release reserved to SG Cowen the right to seek from Twin City that portion of the

settlement amount that Twin City had refused to pay.  Second, SG Cowen's counsel received by

mail a letter from Mr. Butler, dated Tuesday, November 22, 2005 and a check from Twin City,

dated Wednesday, November 23, 2005, in the amount of $1,444,606.14 in payment of a portion

of the approximately $6.85 million sought to be recovered by SG Cowen in this action.  During

his deposition testimony yesterday, Mr. Butler confirmed that this payment reflected a portion of

the unpaid settlement amount.  Such testimony and evidence contradicts, in significant part, the

representations made by Twin City in, inter alia, its Answer and Counterclaim and Motion for

Protective Order.

BOS-918504 v1 0808285-0902

WHEREFORE, SG Cowen respectfully requests that this Court grant leave to file the

Second Supplemental Declaration of Gerald A. Novack, Esq., in the form filed herewith.

Respectfully submitted,


/s/  Aimée E. Bierman
Wm. Shaw McDermott (BBO #330860)
 smcdermott@klng.com
Aimée E. Bierman (BBO #640385)
 abierman@klng.com
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
75 State Street
Boston, MA  02109-1808
(617) 261-3100

Gerald A. Novack, Esq.
 gnovack@klng.com
Jessica L. Jiménez, Esq.
 jjimenez@klng.com
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
599 Lexington Ave.
New York, NY 10022
(212) 536-3900

Dated:  November 29, 2005


**LOCAL RULE 7.1 CERTIFICATION**

The undersigned hereby certifies that on November 29, 2005 at 3:40 p.m., Steven D.

Morris (on behalf of Twin City) and Aimée E. Bierman (on behalf of SG Cowen) conferred

telephonically pursuant to the provisions of Local Rule 7.1 in a good-faith effort to resolve and

narrow the issues presented in this Motion.  The parties were not able to reach agreement on the

issues.

/s/  Aimée E. Bierman
Aimée E. Bierman

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------X

| | |
|---|---|
| SG COWEN & CO., LLC, | : |
| Plaintiff, | : |
| -against- | : |
| TWIN CITY FIRE INSURANCE COMPANY, | : |
| Defendant. | : |

**Civil Action No. 05-11106-PBS**

**SECOND SUPPLEMENTAL DECLARATION OF GERALD A. NOVACK, ESQ.**

---------------------------------------------------------------X

Gerald A. Novack, hereby states as follows:

1.     I am a member of the firm of Kirkpatrick & Lockhart Nicholson Graham LLP, attorneys for the Plaintiff SG Cowen & Co., LLC ("SG Cowen"). I respectfully submit this Second Supplemental Declaration in further opposition to the motion by Defendant Twin City Fire Insurance Company ("Twin City") for a protective order barring discovery of extrinsic or parol evidence relating to the meaning of the Agreement and Conditional Claim Release entered into between SG Cowen and Twin City on April 6, 2005 (the "Release"). I submit this Supplemental Declaration to bring to the Court's attention two events that occurred yesterday, November 28, 2005, which bear upon the existing motion for a protective order and demonstrate that Twin City's motion is not

only meritless but also not brought in good faith.  Those events are: (1) the admissions made by Twin City's representative, Christopher Butler, at his deposition Monday; and (2) the receipt on Monday by SG Cowen of a check from Twin City for approximately $1.4 million, in partial satisfaction of the claim asserted in the Complaint.

2.      Twin City's motion for a protective order (like its Answer with Counterclaim) takes the (unsworn) position that, under the supposedly unambiguous terms of the Release, SG Cowen released any right to sue Twin City for the $6.85 million portion of the Baker litigation settlement that Twin City refused to pay.  According to Twin City, the only right that SG Cowen reserved was to sue Twin City to recover Defense Costs (almost all of which had already been paid!) by the underlying insurance.

3.      At his deposition taken yesterday, Christopher Butler, who negotiated the Release on Twin City's behalf, admitted that SG Cowen had indeed reserved the right to sue to recover that portion of the settlement amount that Twin City was unwilling to pay. (Attached as Exhibit A hereto are excerpts from that deposition.  See discussion below, in ¶¶ 6 - 8)

4.      Mr. Butler's deposition testimony directly contradicts Twin City's reading of the Release and certainly refutes any contention that the Release is so clear and unambiguous that it can only be read as barring the claim asserted by SG Cowen in the Complaint.

5.      During the course of his deposition Mr. Butler disclosed that, on the prior Wednesday, November 23, 2005, he had mailed to SG Cowen's counsel a Twin City

check in the amount of $1,444,606.14, payable to SG Cowen. * (Attached as Exhibit B

hereto is a copy of the Mr. Butler's letter and the accompanying check.) During his

deposition, Mr. Butler testified about the Release and this check.

6.      Mr. Butler conceded that the approach agreed upon during the negotiation

of the Release was to have Twin City pay (on a non-refundable basis) $7.5 million

towards the settlement, with SG Cowen advancing the balance needed to completely fund

the settlement amount (an additional $6.85 million approximately), with the

understanding that the parties would reserve the right to later address the issues arising

from Twin City's refusal to pay more at the time. (Exhibit A, 231:8-22, 233:11 – 234:7)

Mr. Butler also admitted that, in line with this approach, the Release as executed did

reserve to SG Cowen the right to sue Twin City for the approximately $6.85 million it

refused to pay toward the settlement amount.

7.      Thus, Mr. Butler testified that "under the terms of the release ... SG

Cowen has the right to seek ... the $6.9 million that it had to advance to fund the

settlement:" **

> Q.      On the day that the settlement was being funded [on
>          April 8, 2005], it turned out that SG Cowen only had

---

*       At the time of the Release, Twin City had obtained an Audit concluding that
approximately $5.4 million of Defense Costs were unreasonable. Twin City nevertheless
withheld approximately $6.85 million, or approximately $1.44 million more than this Audit
would purportedly justify. This recent $1.44 million payment reflects Twin City's concession
that there was no basis for it to withhold this $1.44 million.

**      During the deposition, as a shorthand reference, the $6.85 million was sometimes
referred to as approximately $6.9 million.

to advance approximately $6.9 million, not the 7.4 that was referred to in the release; correct?

A.   I believe so.

Q.   Now **under the terms of the release**, do you understand that **SG Cowen has the right to seek** from Twin City all or a portion of **the $6.9 million that it had to advance to fund the settlement?**

A.   **Yes.**
(Exhibit A, 16:19 – 17:6) (Emphasis added)

8.   Moreover, Mr. Butler also admitted that the approximately $1.4 million

that Twin City had just paid SG Cowen "was part of the amount that is being sought to be

recovered in the complaint that was filed against Twin City:"

Q.   Let's go up to the first paragraph on page 8 [of Twin City's Answers to Interrogatories], about six lines down. It reads, "Pursuant to the agreement and release, a true copy of which is attached to this answer and counterclaim, the parties agreed to reserve their respective rights to dispute the reasonableness of the defense costs and depending on whether it was determined that the costs were or were not reasonable, SG Cowen's right to recover some or all of the amount it paid to settle the Baker litigation." That statement is true, correct?

A.   That is correct.

Q.   And under the release, SG Cowen reserved the right to recover, "some or all of the amount it paid to settle the Baker litigation"? That's true, isn't it?

A.   Yes.

Q.   You understood that the $1.4 million was a recovery of some part of the amount paid to settle the Baker litigation; did you not?

A.   Yes.

Q.   **Let's go to Butler Exhibit 3, the complaint.** I trust you saw that complaint sometime after it was filed, but before the deposition preparation; correct?

A.   That is correct.

Q.   Did you read the complaint carefully?

4

A.    I believe so.

Q.    **Did you understand that SG Cowen was seeking to recover some part of the amount that it had paid to settle the Baker litigation?**

A.    **Yes.**

Q.    **And recently, as recently as last Wednesday, Twin City recognized its obligation to pay approximately $1.4 million to reimburse it, meaning SG Cowen, for some of the amount it paid to settle the Baker litigation; correct?**

A.    **Yes.**

Q.    So in response to the demand in the complaint, Twin City has now paid $1.4 million; correct?

Mr. Stewart:  Objection.

A.    We've paid $1.4 million because we determined that those expenses were reasonable.

Q.    **You understood that the $1.4 million was part of the amount that is being sought to be recovered in the complaint that was filed against Twin City; correct?**

A.    **I would imagine that is, yes.**
       (Exhibit A, 56:22 – 58:24) (Emphasis added)

9.    It is respectfully submitted that this payment by Twin City, and these admissions by Mr. Butler, make it absolutely clear that there is no basis for the motion for a protective order.

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.  Executed on November 29, 2005.

_Gerald A. Novack_

Gerald A. Novack, Esq.

5

# EXHIBIT A

Page 14
C. Butler
1
2 had no information as to whether they were paid
3 or unpaid.
4       Q.   But you have no information --
5 strike that.  You had no information that you can
6 now recall that there was any amount by way of
7 defense costs that had not been paid at the time
8 you signed the release; is that correct?
9       MR. STEWART:  Objection.  Asked and
10      answered by this witness.
11      MR. NOVACK:  You can answer it.
12      A.   I'm assuming that there were some
13 unpaid defense costs.
14      Q.   I'm not asking you to assume.  I'm
15 asking you to tell me what you remember.  Is it
16 correct, as you sit here today, you cannot tell
17 us that there was a dollar of defense costs that
18 had been submitted that had not been paid by the
19 underlying carriers at the time you signed the
20 release?
21      MR. STEWART:  Objection.  Third
22      time.  Asked and answered.
23      MR. NOVACK:  It was not answered.
24      That's why I'm asking it again.
25      MR. STEWART:  He answered it.  You

Page 15
C. Butler
1
2 didn't like the answer that you got.
3       THE WITNESS:  Could you repeat the
4       question?
5       MR. NOVACK:  I'll have her read it
6       back.
7       (The record was read.)
8       A.   As far as I recall, all defense
9 costs that were submitted had been paid by
10 somebody else.
11      Q.   Would you look at the release,
12 please, Butler Exhibit 1.  Is it your
13 understanding that there are any provisions in
14 the release that permit SG Cowen to seek to
15 recover from Twin City the unfunded portion of
16 the settlement that Twin City refused to advance
17 at the time the release was signed?
18      A.   I'm not sure I understand the
19 question.
20      Q.   I'll break it down, then.  At the
21 time of the settlement being funded, Twin City
22 paid $7.5 million pursuant to the terms of the
23 release; correct?
24      A.   That is correct.
25      Q.   At the time the release was

Page 16
C. Butler
1
2 executed, SG Cowen advanced without prejudice, or
3 it was anticipated it would advance without
4 prejudice approximately $7.4 million to fund the
5 settlement; correct?
6       A.   Correct.
7       Q.   You understood, once the settlement
8 was funded, that in fact, the amount that SG
9 Cowen had to advance was something less than $7.4
10 million, it eventually was around 6.9?
11      MR. STEWART:  Objection.  I think
12      it's 7.5.
13      MR. NOVACK:  Off the record.
14      THE VIDEO TECHNICIAN:  We're going
15      off the record.  The time is 9:53.
16      (Discussion off the record.)
17      THE VIDEO TECHNICIAN:  We're now
18      back on the record.  The time is 9:53.
19      Q.   On the day that the settlement was
20 being funded, it turned out that SG Cowen only
21 had to advance approximately $6.9 million, not
22 the 7.4 that was referred to in the release;
23 correct?
24      A.   I believe so.
25      Q.   Now under the terms of the release,

Page 17
C. Butler
1
2 do you understand that SG Cowen has the right to
3 seek from Twin City all or a portion of the $6.9
4 million that it had to advance to fund the
5 settlement?
6       A.   Yes.
7       Q.   Can you tell me what provision or
8 provisions in the release relate to that answer?
9       A.   On page 2, in the whereas, "Twin
10 City and SG dispute whether coverage is available
11 under the Twin City policy, in whole or in part,
12 for the claims alleged in the Baker and Bamberg
13 litigation and Twin City and SG dispute the
14 reasonableness of the defense costs and other
15 claims and expenses incurred therein."
16      Q.   Let me just ask you, was SG Cowen
17 disputing the reasonableness of the defense
18 costs?
19      A.   As far as I know, yes.
20      Q.   SG Cowen was saying that the defense
21 costs that had been paid that it had submitted
22 were unreasonable?
23      A.   No.  They were saying they were
24 reasonable.
25      Q.   So they weren't disputing the

5 (Pages 14 to 17)

Greenhouse Reporting, Inc.                    (212)279-5108

Page 54

| | |
|---|---|
| 1 | C. Butler |
| 2 | than with vinegar. |
| 3 | MR. STEWART: Mr. Novack is reading |
| 4 | my mind now. |
| 5 | Q. Let's go back to the |
| 6 | interrogatories. We're done with that interlude. |
| 7 | A. Okay. |
| 8 | Q. Would you go to page 8, as your |
| 9 | counsel suggests that I go. Can you go and look |
| 10 | at the text that is on page 8 and follows over to |
| 11 | page 9, and tell me if you disagree with anything |
| 12 | that is stated in there? I presume you have read |
| 13 | this before today, this answer to interrogatory? |
| 14 | A. That is correct. |
| 15 | Q. Based on having read it before |
| 16 | today, and you can look at it again if you like, |
| 17 | is there anything in there that you disagree |
| 18 | with, that you believe may not be stated |
| 19 | accurately? |
| 20 | A. No. |
| 21 | MR. STEWART: The witness has |
| 22 | answered. I was going to ask him to take a |
| 23 | moment to read through it. |
| 24 | MR. NOVACK: If he would like to. I |
| 25 | presume he has read this carefully before. |

Page 55

| | |
|---|---|
| 1 | C. Butler |
| 2 | MR. STEWART: He has but -- |
| 3 | Q. Would you like to look at it again |
| 4 | for a minute? |
| 5 | A. Sure. |
| 6 | Q. Enjoy yourself. |
| 7 | A. Okay. |
| 8 | Q. I'd like to direct your attention to |
| 9 | the second full paragraph on page 8. It reads, |
| 10 | "The claim asserted in SG Cowen's complaint is |
| 11 | barred by the agreement and conditional claim |
| 12 | release. That release bars all claims under the |
| 13 | policy arising out of the Baker litigation, with |
| 14 | the sole exception of defense costs and other |
| 15 | claims expenses. Furthermore, Twin City has |
| 16 | satisfied its obligations under the release by |
| 17 | paying $7,500,000 toward the funding of the |
| 18 | settlement of the Baker litigation and by |
| 19 | agreeing to preserve SG Cowen's right to seek |
| 20 | full recovery of the defense costs and other |
| 21 | claims expenses incurred in the course of the |
| 22 | Baker litigation. Because the complaint seeks |
| 23 | only a portion of the settlement amount for the |
| 24 | Baker litigation, and not defense costs and |
| 25 | claims expenses, as agreed by the parties in the |

Page 56

| | |
|---|---|
| 1 | C. Butler |
| 2 | agreement and conditional release, the claim |
| 3 | asserted by the complaint is barred by the |
| 4 | release as a matter of law." |
| 5 | Now, Twin City just paid $1.4 |
| 6 | million toward the amount of the settlement that |
| 7 | it had not previously funded; correct? |
| 8 | A. It paid the money based upon defense |
| 9 | costs that were determined to be reasonable. |
| 10 | Q. What did you understand the $1.4 |
| 11 | million was to cover? Was it to cover some |
| 12 | portion of the amount paid to settle the Baker |
| 13 | litigation? |
| 14 | A. I'm not sure I understand. |
| 15 | Q. Did you understand the $1.4 million |
| 16 | was reimbursement to SG Cowen for some part of |
| 17 | the amount that Cowen paid to settle the Baker |
| 18 | litigation? |
| 19 | A. It was reimbursement for expenses |
| 20 | that we determined were reasonable. I don't know |
| 21 | what SG Cowen was using it for. |
| 22 | Q. Let's go up to the first paragraph |
| 23 | on page 8, about six lines down. It reads, |
| 24 | "Pursuant to the agreement and release, a true |
| 25 | copy of which is attached to this answer and |

Page 57

| | |
|---|---|
| 1 | C. Butler |
| 2 | counterclaim, the parties agreed to reserve their |
| 3 | respective rights to dispute the reasonableness |
| 4 | of the defense costs and depending on whether it |
| 5 | was determined that the costs were or were not |
| 6 | reasonable, SG Cowen's right to recover some or |
| 7 | all of the amount it paid to settle the Baker |
| 8 | litigation." That statement is true, correct? |
| 9 | A. That is correct. |
| 10 | Q. And under the release, SG Cowen |
| 11 | reserved the right to recover, "some or all of |
| 12 | the amount it paid to settle the Baker |
| 13 | litigation"? That's true, isn't it? |
| 14 | A. Yes. |
| 15 | Q. You understood that the $1.4 million |
| 16 | was a recovery of some part of the amount paid to |
| 17 | settle the Baker litigation; did you not? |
| 18 | A. Yes. |
| 19 | Q. Let's go to Butler Exhibit 3, the |
| 20 | complaint. I trust you saw that complaint |
| 21 | sometime after it was filed, but before the |
| 22 | deposition preparation; correct? |
| 23 | A. That is correct. |
| 24 | Q. Did you read the complaint |
| 25 | carefully? |

Greenhouse Reporting, Inc.                                    (212)279-5108

Page 58
1                    C. Butler
2        A.    I believe so.
3        Q.    Did you understand that SG Cowen was
4    seeking to recover some part of the amount that
5    it had paid to settle the Baker litigation?
6        A.    Yes.
7        Q.    You understood -- withdrawn.  And
8    recently, as recently as last Wednesday, Twin
9    City recognized its obligation to pay
10    approximately $1.4 million to reimburse it,
11    meaning SG Cowen, for some of the amount it paid
12    to settle the Baker litigation; correct?
13        A.    Yes.
14        Q.    So in response to the demand in the
15    complaint, Twin City has now paid $1.4 million;
16    correct?
17            MR. STEWART:  Objection.
18        A.    We've paid $1.4 million because we
19    determined that those expenses were reasonable.
20        Q.    You understood that the $1.4 million
21    was part of the amount that is being sought to be
22    recovered in the complaint that was filed against
23    Twin City; correct?
24        A.    I would imagine that is, yes.
25        Q.    Let's go to Butler Exhibit 4, the

Page 59
1                    C. Butler
2    answer and counterclaim.  Do you have that in
3    front of you?
4        A.    Yes.
5            MR. NOVACK:  Just as an aside, I'm
6            not bothering with foundations at all
7            because I know we have no dispute that
8            these are in fact the operative documents
9            here.  If you have any questions along the
10            way on something like this, just let me
11            know and I'll be glad to authenticate it
12            further.  Let me just state that on the
13            answer here, I don't believe I have
14            attached an exhibit which was a copy of the
15            release, so the answer and counterclaim
16            which is Butler Exhibit 4 is the answer and
17            counterclaim that is filed except that we
18            don't have the attachment.
19        Q.    Mr. Butler, did you look at the
20    answer and counterclaim and review it before it
21    was filed?
22        A.    I don't remember.
23        Q.    Did you have any practice with
24    regard to reviewing documents that were filed by
25    your counsel in connection with this lawsuit

Page 60
1                    C. Butler
2    before they were filed?
3        A.    I would probably have reviewed some
4    of them, yes.
5        Q.    Did you provide any input into
6    the -- without the substance, into the answer and
7    counterclaim?
8            MR. STEWART:  Just yes or no.
9        A.    No.
10        Q.    When you say no, do you mean that
11    you didn't see the document and make any
12    suggestions as to language, or what do you mean
13    exactly?  No input at all?
14        A.    Not that I can recall, no.
15        Q.    Did it come as a surprise to you
16    that an answer and counterclaim had been filed?
17        A.    No.
18        Q.    Did you know one was being prepared?
19        A.    I would imagine I did.
20        Q.    You don't remember?
21        A.    No.
22        Q.    Do you remember seeing any draft of
23    an answer and counterclaim before one was filed?
24        A.    I don't remember.
25        Q.    Did there ever come a time when you

Page 61
1                    C. Butler
2    reviewed the answer and counterclaim to see if
3    you agreed with what was stated in it?
4        A.    I don't recall.
5        Q.    When is the first time you can
6    remember looking at the answer and counterclaim?
7        A.    I don't have any specific
8    recollection.
9        Q.    Do you have a general recollection?
10        A.    No.
11        Q.    The answer and counterclaim is dated
12    August 5, 2005.  Do you see that?
13        A.    Yes.
14        Q.    Do you recall whether or not you saw
15    the answer and counterclaim in August 2005?
16        A.    It's quite possible I did.
17        Q.    When you looked at it, did you read
18    it to see what it said?
19            MR. STEWART:  Objection.
20        Q.    Did you just look and say, "Oh,
21    here's the answer and counterclaim," and file it
22    or did you actually read it?
23            MR. STEWART:  Objection.
24        A.    I don't recall.
25        Q.    When is the next time you saw the

Page 230

1                    C. Butler
2        A.    I don't.
3        Q.    Do you recall anything general about
4  any conversations you had with Mr. Kohlberger
5  about the release?
6        A.    I don't.
7        Q.    Did you take any notes, even though
8  you may not have them any longer, of any
9  conversations that you may have had with either
10  Mr. Zimmerman, Mr. Kohlberger or Mr. Morrison
11  during the period January 2005 up until the time
12  the release was signed?
13        A.    Not that I recall.
14        Q.    You don't recall taking any notes in
15  any of those calls?
16        A.    That is correct.
17        Q.    Did you report to anybody at the
18  Hartford on any of the conversations you had
19  during the period January of 2005 up through the
20  time the release was signed with respect to what
21  the discussions were about the release?  Other
22  than saying, "Here's a release.  Here's a
23  document," or whatever, did you report to anyone
24  in the Hartford on any discussions that you had
25  with anyone at Skadden Arps about the terms of

Page 231

1                    C. Butler
2  the release?
3          MR. STEWART:  Objection.  Asked and
4      answered this morning.
5        Q.    Was the answer no?  If you remind
6  me, then I'll --
7        A.    The answer was no.
8          MR. NOVACK:  Thank you for your
9      help.  Let's go to Butler Exhibit 23.
10          (Butler Exhibit 23, e-mail from
11      Chris Butler to Peter Morrison at the top
12      of the e-mail string and beneath it on the
13      second page is an e-mail from Peter
14      Morrison to Chris Butler, marked for
15      identification.)
16        Q.    It purports to be an e-mail from
17  Chris Butler to Peter Morrison at the top of the
18  e-mail string and beneath it on the second page
19  is an e-mail from Peter Morrison to Chris Butler.
20  Peter Morrison's to Butler is March 16, 2005 at
21  4:02, and Chris Butler's e-mail to Peter was at
22  2:07 that same day.
23          I can't tell, frankly -- the first
24  e-mail says, "Peter, below is a list of some
25  questions, the answers to which would be very

Page 232

1                    C. Butler
2  helpful in working through these issues."  Then
3  at the bottom of the page, you say, "In order to
4  expedite the settlement, we renew our offer to
5  fund agreed upon portion of the settlement."  Do
6  you see that, the last paragraph?
7        A.    Yes.
8        Q.    "In order to expedite the
9  settlement, we renew our offer to fund an agreed
10  upon portion of the settlement subject to mutual
11  reservation of rights with SG Cowen, pending
12  resolution of these issues and our fee audit.
13  Alternatively, we would be willing to fund an
14  undisputed amount at this time with SG Cowen
15  funding the balance.  We could then continue to
16  address these issues.  Let me know your
17  thoughts."  Look at the language I just quoted,
18  "We renew our offer to fund an agreed upon
19  portion of the settlement subject to the mutual
20  reservation of rights."  You were talking about
21  paying some amount toward the settlement, and
22  reserving your rights with respect to whether an
23  additional amount toward the settlement had to be
24  paid; is that not right?
25        A.    Well, no -- I'm not sure.

Page 233

1                    C. Butler
2        Q.    Explain to me what makes you unsure.
3        A.    Reading this, it could be read to be
4  that we would be funding an agreed upon portion,
5  and the reservation of rights would be mutual, so
6  that either we could then contend that we should
7  be reimbursed for some portion of what we paid or
8  SG Cowen could contend that they should be --
9  that they would be entitled to additional
10  payment.
11        Q.    I see.  Then you say,
12  "Alternatively, we would be willing to fund an
13  undisputed amount at this time with SG Cowen
14  funding the balance."  And that was the approach
15  you finally took?
16        A.    Yes.
17        Q.    And then it said, "We could then
18  continue to address these issues."  The issues
19  you were referring to here were the issues
20  relating to how much Twin City would contribute
21  toward the settlement; were they not?
22        A.    It would be how much we would be
23  paying under the policy.
24        Q.    Toward the settlement?
25          MR. STEWART:  Objection.

Page 234

1          C. Butler
2     A.    To reimburse SG Cowen.
3     Q.    For the settlement?
4     A.    For the amount that they put out,
5  yes.
6     Q.    To pay the settlement; correct?
7     A.    Yes.
8          (Butler Exhibit 24, string of
9  e-mails, marked for identification.)
10    Q.    Let's go to Butler Exhibit 24.  This
11 purports to be an e-mail or a string of e-mails.
12 You can take a look at them.  I'm interested in
13 the top page, Peter Morrison to you, March 16th.
14          Did you receive this on or about the
15 16th of March as best you can tell?
16    A.    I don't specifically recall, but I
17 have no reason to think I didn't.
18    Q.    And we see that there's information
19 about the amount that has been paid by the
20 underlying insurers in respect of either other
21 claims or toward the defense costs in connection
22 with this claim; correct?
23    A.    Correct.
24    Q.    You were aware that the underlying
25 insurers' policies were being eroded or perhaps

Page 235

1          C. Butler
2  exhausted by payment of these defense costs as
3  well as the other claim; correct?
4     A.    As well as this particular claim.
5     Q.    And you see that Mr. Morrison asks
6  you for a release, a form of release for the next
7  day.  That would be the 17th of March.
8          Do you recall any conversation with
9  him on or around the 16th about that release or
10 all you can recall is that you were getting these
11 e-mails?
12    A.    I don't recall any conversation.
13          MR. NOVACK:  Let's go to Butler
14 Exhibit 25.
15          (Butler Exhibit 25, e-mail from
16 Anthony Hernandez to Christopher Butler,
17 marked for identification.)
18          MR. STEWART:  Before we begin that,
19 can we take a very short five minutes?
20          MR. NOVACK:  Sure.
21          THE VIDEO TECHNICIAN:  We're going
22 off the record.  The time is 3:38.
23          (Recess taken.)
24          THE VIDEO TECHNICIAN:  We are now
25 back on the record.  The time is 3:42.

Page 236

1          C. Butler
2     Q.    Mr. Butler, we just had an off the
3  record break.  Is there any testimony you want to
4  change?
5     A.    No.
6     Q.    Good.  We're up to 25, Butler
7  Exhibit 25 now.  That's the last one you have in
8  front of you.
9     A.    Yes.
10    Q.    Butler Exhibit 25 appears to be an
11 e-mail from Mr. Hernandez to you, referring to a
12 conference call.  The question is, was Brian
13 Beale still involved in the picture as of March
14 17, 2005?
15    A.    I don't believe so.
16          MR. NOVACK:  Let's go to March 18,
17 Butler Exhibit 26.
18          (Butler Exhibit 26, March 18 e-mail
19 to Christopher Butler from Patricia Dee
20 Bilka, marked for identification.)
21    Q.    It appears to be an e-mail to you
22 from Patricia Dee Bilka.  Do you recall receiving
23 that e-mail from her on or around that date?
24    A.    No.
25    Q.    Do you have some reason to think you

Page 237

1          C. Butler
2  didn't get it?
3     A.    No.
4     Q.    Generally speaking, do you recall
5  that your e-mail system was in working order
6  during the first half of 2005?
7     A.    Yes.
8     Q.    So if someone had the right e-mail
9  address, they probably would get through to you?
10    A.    Yes.
11    Q.    Thanks.  You see the e-mail at the
12 bottom of that page, which is at 1:38 p.m.  The
13 one at the top of the page was at 10:54 a.m.  It
14 says, "I have spoken with AIG regarding the
15 excess carriers' request for copies of the
16 bills."  Do you recall having a conversation with
17 Annemarie Mazzone about getting copies of bills?
18    A.    Generally.
19    Q.    Basically, it was your effort during
20 this period in March to see what the erosion had
21 been on the underlying policies?
22    A.    Yes.
23          MR. NOVACK:  Let's go to Butler
24 Exhibit 27.
25          (Butler Exhibit 27, March 16, 2005

Greenhouse Reporting, Inc.                                        (212)279-5108

# EXHIBIT B



**THE HARTFORD**

**Christopher J. Butler, Esq.**
Assistant Vice President
Telephone (212) 277-0476
Facsimile (917) 464-6456
chris.butler@thehartford.com

November 22, 2005

Jessica Jimenez, Esq.
Kirkpatrick & Lockhart
599 Lexington Avenue
New York, NY 10022

       **RE:**    **Societe Generale- Baker**

Dear Ms. Jimenez:

Enclosed is a check for $1,444,606.14 which is a reimbursement of defense costs for the referenced matter.

Please do not hesitate to call me if you have any questions.

                      Very truly yours,

                      Christopher J. Butler

Hartford Financial Products
2 Park Avenue
New York, NY 10016

Hartford Fire Insurance Company

CHECK AMOUNT

PAYEE:    SOCIETE GENERALE, NEW YORK

IN PAYMENT OF:    REIMBURSEMENT FOR BAKER MATTER

INSURED:    SOCIETE GENERALE, NEW YORK

CLAIMANT:    BAKER, JANET ET AL



THE HARTFORD

$    1,444,606.14

| POLICY | CLAIM/CLMNT | PAY TYPE | EXAM | LOSS DATE | AMOUNT |
|---|---|---|---|---|---|
| NDF0130761 | 01281784 01 | J4 | 52000 | 06/06/01 | 1,444,606.14 |

For Check Information, please call 1(212) 277-0479.

CHECK NO.    93092073

Form T-258-7  Printed in U.S.A.

No. 9123847

THIS IS WATERMARKED PAPER - DO NOT ACCEPT WITHOUT NOTING WATERMARK - HOLD TO LIGHT TO VERIFY WATERMARK



THE HARTFORD

Fleet National Bank
150 Windsor St.
Hartford, CT 06120

51-44
119

NUMBER
93092073

| POLICY NUMBER | CLAIM NUMBER | CHECK DATE | AMOUNT |
|---|---|---|---|
| NDF0130761 | 01281784 | 11/23/05 | $****1,444,60... |

HARTFORD FIRE INSURANCE COMPANY • Hartford, Connecticut 061

PAY TO THE ORDER OF    SOCIETE GENERALE, NEW YORK

THE AMOUNT OF    ONE MILLION FOUR HUNDRED FORTY-FOUR THOUSAND SIX HUNDRED SIX DOLLARS AND 14/100

JESSICA JIMENEZ, ESQ.
KIRKPATRICK & LOCKHART
599 LEXINGTON AVENUE
NEW YORK, NY 10022

Authorized Signature

⑈93092073⑈ ⑉011900445⑉ 4869⑈