# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SG COWEN & CO., LLC, )
)
               Plaintiff, )
)
                v. )       C.A. No. 05-11106-PBS
)
TWIN CITY FIRE INSURANCE )
COMPANY )
)
              Defendant. )
)

## AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiff, SG Cowen & Co., LLC, formerly known as SG Cowen Securities

Corporation ("SG Cowen"), for its Amended and Supplemental Complaint against Defendant

Twin City Fire Insurance Company ("Twin City"), alleges as follows.

## PARTIES

1.      SG Cowen is a limited liability company organized and existing under the

laws of Delaware, whose sole member is SG Americas Securities Holdings, Inc.

("Holdings"), a corporation organized under the laws of Delaware. Both SG Cowen and

Holdings have their principal places of business in New York, New York. SG Cowen is

engaged in the business of providing investment banking and financial services, and at all

times relevant has maintained an office in Boston, Massachusetts.

NY-406494 v1

2.      Twin City is a corporation duly organized and existing under the laws of Indiana, with its principal place of business in Hartford, Connecticut.  Twin City is transacting and licensed to do business in the Commonwealth of Massachusetts.

## SUBJECT MATTER JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity between Plaintiff and Defendant and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.      Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §1391(2) because a substantial part of the events giving rise to these claims occurred in this judicial district.

## FACTS

### The Underlying Litigation

5.      This dispute between SG Cowen and its insurer Twin City is an outgrowth of the settlement (the "Settlement") by SG Cowen of two securities fraud actions, seeking hundreds of millions of dollars in damages, that were previously before this Court:  Baker et al. v. KPMG LLP et al., No. 02-CV-10305-PBS and Roth et al. v. KPMG LLP et al., No. 02-CV-10304-PBS (collectively the "Baker Litigation" or "Baker Claim").  The Baker Litigation arose, in part, out of the activities of SG Cowen employees located in its Boston office.  In early April 2005, SG Cowen paid the plaintiffs in the Baker Litigation a specified sum to settle all of the claims asserted against SG Cowen (the "Settlement Payment").  There

2

is no dispute as to the reasonableness of the Settlement and Twin City consented to its amount, as did all the other insurers covering the claim.

6.     In this action, SG Cowen is suing Twin City because of its failure to fund its full portion of the Settlement Payment, in accordance with the terms of the excess insurance policy Twin City had issued to SG Cowen (the "Twin City Policy" or "Policy"). SG Cowen has fully paid its premiums due and otherwise performed its obligations under the Policy. Broadly, the Twin City Policy provides insurance of up to $15 million in excess of the total limits of liability (and any self insured retention or deductible) under specified policies of underlying insurance that were issued by various carriers (the "Underlying Insurers") as part of SG Cowen's insurance program. Underlying the Twin City Policy was a primary policy, and three policies of excess insurance. The Twin City Policy provides that liability under it "shall attach … after the Primary and Underlying Excess Insurers shall have duly admitted liability and shall have paid the full amount of their respective liability (hereinafter referred to as the 'Underlying Insurance') …." (Policy, § II A) The Twin City Policy "follows form," generally providing coverage in accordance with the terms and conditions of the Underlying Insurance. The Underlying Insurance covered not only SG Cowen's potential liability on any covered claims, but also the fees and expenses or defense costs associated with defending those claims. Payments made toward defense costs reduce the available policy limits.

7.     As is customary, when there is both a primary policy and excess policies, when defense costs are incurred by an insured they are submitted to the lowest level insurer in the program with available coverage. That insurer reviews those defense costs to confirm

3

that they are within the coverage of its policy, makes such deductions as it deems warranted and then pays the approved costs. An insured does not submit claims for defense costs to policies higher in the "stack" until such time as the lowest level available policy has been exhausted, either by payment of defense costs, a settlement, or a combination of the two.

8.      When the Baker Claim was asserted against SG Cowen, SG Cowen submitted to the first-tier excess insurer in its program (the primary policy having been exhausted by unrelated claims) invoices for the defense costs (legal and other professional fees, and related disbursements) that had been incurred by SG Cowen in defending against the Baker Claim (the "Defense Costs"). When it appeared that this first-tier excess policy had been exhausted, SG Cowen submitted its invoices for Defense Costs to the second-tier excess insurer. Those invoices for these Defense Costs were reviewed by these insurers, certain deductions were made, and the balance of the Defense Costs paid. Although Twin City had been aware of the Baker Litigation for years, Twin City did not request that it be permitted to review any of these invoices for Defense Costs before they were paid, and never requested that these insurers refuse to pay any of the Defense Costs on the basis that they were supposedly unreasonable. Under the terms of the Twin City Policy, SG Cowen was neither obligated nor entitled to submit any invoices for Defense Costs to Twin City for payment under its policy until the Underlying Insurance had been exhausted. Of course, under the terms of the Twin City Policy, SG Cowen was not entitled to submit to Twin City for payment, a second time, the same invoices that the Underlying Insurance had already paid.

4

**Twin City Agrees To The
Settlement But Begins To
<u>Balk On Its Funding</u>**

9.      While summary judgment motions were pending in the Baker Litigation, the parties agreed to a settlement in principle.  On February 2, 2005, Christopher Butler, the Twin City Claims Consultant handling the matter for the insurer, advised SG Cowen that Twin City agreed in principle to the Settlement, including its amount.

10.     At the time, Twin City anticipated that its share of the Settlement, after taking into account the erosion of the Underlying Insurance and payments that would be made by the Underlying Insurers to fund the Settlement, would be approximately $7.5 million.  Around mid-March 2005, however, Twin City learned from the Underlying Insurers that the erosion of their policies was greater than it had anticipated at the time it agreed to the Settlement.  Twin City now discovered that its share of the Settlement would not be the $7.5 million it had anticipated, but rather approximately $14.3 million.  Nonetheless, Twin City did not withdraw its approval of the Settlement, because Twin City found the Settlement sufficiently attractive to want it to go forward.

11.     It was at this point that Twin City apparently determined to find a way to keep its share of the Settlement down to about the $7.5 million figure that Twin City had anticipated when it had approved the Settlement in early February.

5

NY-406494 v1

**The Twin City "Audit" Disputing**
**$5.4 Million Of The Defense Costs**

12.     By mid-March 2005, Twin City had obtained copies of the invoices for

Defense Costs submitted by the law firm serving as the principal defense counsel for

SG Cowen in the Baker Litigation.  These invoices, paid by the Underlying Insurers, covered

the period September 2001 through the end of January 2005.  Twin City then quickly

obtained an "Audit" of those invoices and used this March 2005 Audit as a pretext for

refusing to fully fund Twin City's share of the Settlement.

13.     This so-called Audit was performed by a lawyer at an outside law firm with

which Twin City had previously dealt.  The lawyer who performed this Audit had no

experience in handling securities litigation, much less a case with the hundreds of millions of

dollars at stake as in the Baker Litigation.  Nevertheless, this inexperienced – and

unidentified – attorney was somehow able to speedily analyze this mass of billing

information (without once asking any questions of SG Cowen's defense counsel) and

produce a detailed Audit, which was apparently embodied in the text of a letter from Butler

to SG Cowen, dated March 22, 2005.  That letter setting out the results of the Audit

concluded that $5,411,237 in previously paid Defense Costs was unreasonable by the

standards of The Hartford Financial and Professional Group Billing Guidelines.  (Those

Billing Guidelines had never been furnished to SG Cowen's defense team.)

14.     During discussions with SG Cowen in March/early April 2005, Twin City took

the position that it could challenge the judgments of the Underlying Insurers concerning the

reasonableness of these Defense Costs.  Twin City's view was that, even though the

Underlying Insurers had fully paid out the limits of their policies (with the combination of payments of Defense Costs and the Settlement contributions), the Underlying Insurance was not fully exhausted to the extent that any payments went for these allegedly unreasonable Defense Costs.

15.     Based on this March Audit concluding that there was approximately $5.4 million paid for unreasonable Defense Costs, Twin City stated that it would withhold a like amount from the amount it otherwise would have been obligated to pay towards the Settlement.

**Twin City Arbitrarily Withholds**
**An Additional $1.4 Million**

16.     The March Audit only purported to justify Twin City withholding approximately $5.4 million.  In order to limit Twin City's contribution to the Settlement to the $7.5 million it desired, Twin City had to find another reason to withhold an additional amount of approximately $1.4 million.  The solution to this problem was simple; Twin City arbitrarily held back an additional $1,444,606.14.

17.     Butler advised SG Cowen that Twin City was withholding this additional amount on the chance that there would be an additional $1.4 million in previously-paid Defense Costs that Twin City would find to be unreasonable, after it had reviewed more invoices.  At the time Butler made this decision, Twin City had no information that there were any such additional Defense Costs that were allegedly unreasonable.

NY-406494 v1

18.    Together, this $5.4 million Audit and the arbitrary $1.4 million holdback brought Twin City's share of the Settlement Payment down to the $7.5 million that Twin City had originally intended to pay when it consented to the Settlement in early February 2005.

**SG Cowen Disputes Twin City's**
**Unreasonable Defense Costs Argument**

19.    About the time that Twin City announced that it was holding back these sums, SG Cowen responded by disputing Twin City's "unreasonable Defense Costs" theory, i.e., its theory that it could second-guess the judgments of the Underlying Insurers, and make its own belated *de novo* judgments as to the reasonableness of these Defense Costs.  In addition, SG Cowen disagreed with Twin City's conclusion that these Defense Costs were unreasonable.

**No Dispute As To**
**The Recently-Incurred**
**Unpaid Defense Costs**

20.    Although Twin City and SG Cowen were, at the time the Settlement was being finalized, disputing whether Twin City could argue that its contribution to the Settlement could be reduced by the amount of these allegedly unreasonable Defense Costs paid by the Underlying Insurers, they had no dispute as to a relatively small group of invoices for Defense Costs that had recently been incurred in the last stages of the Baker Litigation.

21.    In late March 2005, the parties anticipated that SG Cowen would shortly be submitting to Twin City, after the Settlement was implemented in early April, the invoices

8

for these recently-incurred Defense Costs.  Since the Underlying Insurance had been

exhausted by the Settlement, under the terms of the Twin City Policy SG Cowen was now

entitled to seek directly from Twin City recovery of these recently-incurred Defense Costs.

It was later determined that these recently-incurred Defense Costs, which Twin City

eventually paid without dispute, were approximately $100,000.

**The Release**

22.     As a result of Twin City's eleventh hour refusal to fund its full share of the

Settlement, the parties were at an impasse.  From Twin City's point of view, if it simply

refused to pay its full share of the Settlement, it might expose itself, among other things, to a

claim for damages in excess of its policy limits or other claims.  For its part, SG Cowen was

interested in obtaining as much of an immediate contribution from Twin City as was

possible.  The solution to this impasse was the agreement embodied in the Agreement and

Conditional Claim Release (the "Release"), which was executed on April 6, 2005, two days

before the Settlement was to be funded.

23.     The Release provided an interim solution to the problem.  The basic approach

taken in the Release was to provide for Twin City to pay (on a non-refundable basis)

$7.5 million towards the Settlement.  SG Cowen would advance, on a without prejudice

basis, the shortfall (of approximately $6.8 million) resulting from Twin City's refusal to fully

fund its share of the Settlement.  The Release preserved SG Cowen's right to recover the

unpaid portion of the Settlement, and to dispute Twin City's "unreasonable Defense Costs"

theory on two grounds:  first, Twin City had no right to second-guess the exhaustion of the

9

Underlying Insurance; and second, in any event, none of the previously-paid Defense Costs were unreasonable.  The Release also preserved SG Cowen's right to recover the approximately $100,000 in recently-incurred Defense Costs.

24.     The Release was negotiated by Butler on Twin City's behalf, and he was the sole negotiator for Twin City.  The Release specifically refers to the parties' intention <u>not</u> to release any claims involving "any issues related to or in any way concerning the reasonableness of Defense Costs."  (Whereas Clause, pp. 2-3)

25.     Further, paragraph 2 of the Release contains the carve-out that implements this intention, as well as includes the reservation of the <u>additional</u> right preserved for SG Cowen, which was to "seek full recovery [from Twin City] of the Defense Costs" that had recently been incurred.  In pertinent part, paragraph 2 reads as follows:

> [E]ach party reserves its respective rights [over the] dispute [concerning] the reasonableness of Defense Costs and other Claims Expenses incurred in the course of the Baker … litigation, **and** SG [Cowen] reserves its right to seek full recovery of the Defense Costs and other Claims Expenses…. (Emphasis added)

## The April 8, 2005 Meeting

26.     On April 8, 2005, the day the Settlement was being funded, Twin City paid the $7.5 million called for by the Release.  That same day, Butler attended a meeting with representatives of SG Cowen to discuss the issues in dispute between Twin City and SG Cowen.  SG Cowen's representatives explained to Butler why Twin City had to respect the

exhaustion of the Underlying Insurance and was therefore required to pay the additional $6.8 million towards the Settlement that it was refusing to pay.

27.     Among other things discussed at that meeting, SG Cowen's representatives explained at length that, as a threshold matter, Twin City had no legal or contractual right to second-guess the previously paid Defense Costs.  Similarly, SG Cowen asked whether Twin City would at least pay the additional $1.4 million as to which there was no dispute.  Butler stated that before he could take a position in response he first had to review those issues with individuals at Twin City that he referred to as the "decision-makers."  Butler added that he would do so promptly, and professed to be sincere in his commitment to actively explore with these decision-makers whether the way in which Twin City was handling this claim was authorized by its Policy, as well as fair and equitable.

28.     By late May 2005, despite several requests by SG Cowen, Butler had not made any proposal to SG Cowen, nor agreed to arrange any meeting between SG Cowen and the decision-makers to which Butler was referring in these discussions.  Nor, as SG Cowen was to learn much later, was Butler even communicating with any of Twin City's decision-makers concerning the SG Cowen claim.

**Twin City Determines That SG Cowen
Is Owed At Least Another $1.4 Million**

29.     Unbeknownst to SG Cowen at the time (and until Butler's deposition on November 28, 2005), perhaps as early as the end of May 2005, and no later than August

11

2005, Butler had concluded that there was no justification for withholding the additional $1.4 million from Twin City's contribution towards the Settlement.  (See ¶ 61 below)

30.     Although there was no longer any justification for not paying SG Cowen this $1.4 million immediately, Butler decided not to do so.  Instead, Twin City withheld making the payment until the eve of Butler's deposition in late November 2005.  (See ¶¶ 54-56, 61 below)

**SG Cowen's Complaint**
**In This Action**

31.     By letter dated May 26, 2005, SG Cowen's counsel informed Twin City that Butler's refusal to respond indicated that Twin City was not acting in good faith, and that SG Cowen would proceed on this assumption unless Butler arranged an immediate meeting with the Twin City decision-makers to whom Butler was supposedly relaying SG Cowen's position and arguments.  Neither Butler nor anyone else at Twin City ever responded to this letter.  Instead, that same day, the law firm that is now serving as counsel for Twin City in this litigation contacted SG Cowen's litigation counsel, advising that they had been retained as outside counsel for Twin City to handle this matter.

32.     SG Cowen's Complaint in this action was filed that same day, May 26, 2005. The Complaint did not seek to recover any Defense Costs from Twin City, because at the time it was filed all of the Defense Costs had already been paid by the Underlying Insurance, and there was no dispute as to the recently-incurred Defense Costs, which Twin City ultimately paid.

12

NY-406494 v1

**Overview Of
Twin City's Litigation
Strategy Employing
Deceptive Acts And Unfair
Claims Settlement Practices**

33.     From the outset of this action, Twin City has engaged in a series of deceptive

acts and practices, and many of the types of conduct that are statutorily-recognized by the

Commonwealth of Massachusetts as unfair claims settlement practices for insurers.  Twin

City's overall goal in committing these prohibited acts and practices has been to avoid

honoring its conceded obligations to SG Cowen.  Failing that, at the very least, Twin City

seeks to litigate issues not with the purpose of prevailing on them, but for the ulterior motive

of creating such delay, expense, and inconvenience for SG Cowen that it will provide Twin

City leverage in its effort to extract a favorable settlement for an amount less than Twin City

knows it should be paying.

34.     At the time this litigation was begun, Butler – Twin City's sole representative

in the negotiation and drafting of the Release – knew that the parties' agreement, as

embodied in the Release, was that SG Cowen would have the right to sue Twin City for its

unpaid portion of the Settlement, namely the $6.8 million that Twin City had withheld (the

$5.4 and $1.4 million holdbacks).  Indeed, there is evidence that when the litigation began

Butler had already concluded that Twin City owed SG Cowen at least $1.4 million more

towards the Settlement.

35.     In this litigation, instead of acknowledging this $1.4 million obligation to

SG Cowen and paying it, Twin City took exactly the opposite approach.  Twin City filed an

13

Answer asserting that it had fully performed all of its obligations under the Release and thus SG Cowen was owed nothing. (See ¶¶ 38-41 below)

36.     Similarly, instead of acknowledging that SG Cowen had reserved the right, under the Release, to sue to recover the unpaid portion of the Settlement, Twin City argued that there was no such right, alleging that the only right reserved to SG Cowen in the Release was the right to sue Twin City for Defense Costs.  Happily for Twin City, as it noted in its Answer, since all the Defense Costs had previously been paid by the Underlying Insurance, the Complaint had to be dismissed. (See ¶¶ 39-41 below)

37.     Adding insult to injury, Twin City's Answer also interposed a Counterclaim seeking damages from SG Cowen for having sued Twin City to recover this unpaid portion of the Settlement amount – even though Butler knew that Twin City owed SG Cowen at least another $1.4 million, as sought by the Complaint.  (See ¶¶ 42, 61 below)  As discussed below, this strategy was followed in all of Twin City's filings, not only in its Answer.

**Twin City's Answer**

38.     On August 5, 2005, Twin City filed its original Answer to the Complaint.

39.     The core premise of the Answer was that the only right reserved to SG Cowen by the Release was the right to sue for Defense Costs.  Twin City sought to support this argument by citing the language in the Release that was inserted in order to preserve SG Cowen's right to sue Twin City for the recently-incurred Defense Costs, treating that as the only right reserved, and ignoring the other language in the Release referring to the

14

NY-406494 v1

parties' intention to reserve all of their rights with respect to "any issues related to or in any way concerning the reasonableness of [the] Defense Costs" that the parties were disputing. Twin City's Answer concluded that, since all of the Defense Costs had concededly been paid by the Underlying Insurers, there was nothing for which Twin City could be held liable to SG Cowen.

40.     Thus, Twin City's Second Defense (Answer, ¶¶ 16-17) refers to the language in the Release preserving SG Cowen's right to "seek full recovery" of the recently-incurred Defense Costs, and continues that since all the Defense Costs had already been paid by the Underlying Insurance, the Complaint had to be dismissed:

> 18.     **The Defense Costs … referred to in the Release [in Paragraph 2] have been satisfied by the Underlying Policy Coverage.**  The dispute referred to in Paragraph 2 between SG Cowen and Twin City, therefore does not exist.

> 19.     Accordingly, Plaintiff's claims as set forth in the Complaint do not involve the Defense Costs … referred to in the Release and are, therefore, barred by the terms of the Release. (Emphasis added)

41.     Twin City's Third Defense also argued that it owed nothing to SG Cowen. The Third Defense referred to the $7.5 million that Twin City had already paid, and alleged that "there has been full accord and satisfaction between the parties" and "therefore, Plaintiff is not entitled to recover."  (Answer, ¶¶ 25-26)

42.     In its Counterclaim, Twin City reiterated its allegations that SG Cowen could only sue for Defense Costs, and since all Defense Costs had all been paid, SG Cowen had

breached its contractual obligations under the Release by bringing this action. The damages that Twin City sought on its Counterclaim (as explained in its Initial Disclosures), were the attorneys fees and expenses incurred in defending against the Complaint. Thus, the Counterclaim states, in part, as follows:

> 3.  Paragraph 3 of the Release required SG Cowen to release Twin City from all claims arising from … the [underlying] litigation, with the sole exception of claims related to the Defense Costs …, **which SG Cowen admits have been satisfied by the Underlying Policy Coverage**.

> 4.  Accordingly, SG Cowen breached its obligation … by filing the Complaint … seeking payment in excess of the $7,500,000 already paid by Twin City …. (Emphasis added)

**Twin City's Effort To
Avoid Butler Having To Testify**

43. Twin City knew that if Butler were deposed, and he testified truthfully, he would admit that he understood – directly contrary to the position taken in Twin City's Answer and its overall litigation strategy – that:

> (a)  SG Cowen was not limited to suing only to recover Defense Costs;

> (b)  the fact that the Underlying Insurance had paid all of the Defense Costs in no way affected SG Cowen's right to sue to recover the unpaid portion of the Settlement; and

> (c)  SG Cowen had the right to sue to recover the $6.8 million unpaid portion of the Settlement, and in fact Twin City owed SG Cowen at least an additional $1.4 million on this claim.

16

44.     In an effort to keep Butler from having to testify about these matters, Twin City attempted to obtain a stay of all discovery by announcing that it intended to promptly make a motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, based on the terms of the Release – which it argued only permitted a suit to recover Defense Costs and not the unpaid portion of the Settlement.

45.     Even if the motion were ultimately unsuccessful, at the very least this tactic would delay the time of ultimate reckoning for Twin City, allow it to continue to hold on to millions of dollars that Twin City knew belonged to SG Cowen and further Twin City's ulterior purpose of applying pressure to extract a more favorable settlement.

46.     Twin City's plan for protecting Butler from having to testify is reflected in the parties' Joint Statement Pursuant to Local Rule 16.1, dated September 29, 2005, which contained Twin City's individually drafted Statement of the Case (Joint Statement, pp. 10-12).  In its Statement, Twin City stated its intention to make a "motion for judgment on the pleadings" before October 19, 2005, on the ground that the "effect of the Release on SG Cowen's Complaint … is a matter of law that should be resolved on a motion for judgment on the pleadings without the need for any discovery."  For this reason, Twin City "object[ed] to any discovery unless its motion for judgment on the pleadings is denied." (Joint Statement, pp. 11-12)

47.     If, by some chance, Twin City were somehow successful on its motion, that result would be a bonanza for Twin City.  Any such judgment under Rule 12(c) would be on the merits and presumably *res judicata,* and therefore forever bar any later claim by

17

SG Cowen for any part of the $6.8 million, including any claim for the $1.4 million that Butler already knew that Twin City owed to SG Cowen.  Twin City was evidently perfectly comfortable seeking such a final judgment of no liability even though Twin City knew that it had a liability to its insured of at least this $1.4 million.

**Twin City Continues To
Follow Its Strategy At The
<u>Rule 16 Scheduling Conference</u>**

48.     The Rule 16 scheduling conference was held on October 5, 2005.  At the scheduling conference, Twin City pressed its basic position that the Complaint had to be dismissed, as a matter of law, because it did not seek to recover Defense Costs.  Twin City also requested an order barring all discovery until Twin City could obtain a determination of its contemplated motion for judgment on the pleadings.

49.     During the Rule 16 conference, SG Cowen's counsel predicted in open court that Twin City's reading of the Release would be contradicted by Butler, its principal draftsman, who would admit (assuming he testified truthfully) that the parties' intention was to preserve SG Cowen's right to sue for the unpaid  portion of the Settlement Amount.  (At the time of the conference, SG Cowen did not also know that Butler had already determined that SG Cowen was owed at least $1.4 million.)

50.     The Court refused to stay all discovery, but limited it to the issues relating to the meaning of the Release and Twin City's claim that SG Cowen's bringing of this action was a breach of the Release, requiring SG Cowen to pay Twin City's legal fees and expenses.  The Court also suggested that Twin City not make any Rule 12(c) motion, but

rather wait to move for summary judgment when discovery was over, and that is the course

that Twin City has followed.

**In Seeking A Protective Order, Twin City**
**Continues To Assert That The Release**
**Only Permits A Claim For Defense Costs**

51.     On October 12, 2005, SG Cowen served its First Set Of Interrogatories on

Twin City, as well as a Request For Production of Documents.  On October 26, 2005, Twin

City filed its motion for a protective order limiting certain aspects of discovery.

52.     Twin City's Memorandum Of Law in support of its motion stated that

SG Cowen's claims do not "fit within the narrow exception set forth in the Release. …

[whose] "sole" exception … is for Defense Costs and other Claims Expenses."   (Twin City's

Protective Order Memo, p. 8, fn 1)   Twin City also argued that SG Cowen's position that the

Release "did not in any way extinguish" its right to recover the unpaid Settlement amount

was contrary to the terms of the Release.  (Twin City Protective Order Memo, p. 8)

**Twin City's Answers To Interrogatories**
**Continue To Assert That The Release**
**Only Permits A Claim For Defense Costs**

53.     Twin City's Answers to SG Cowen's First Set of Interrogatories, verified by

Butler, were served on SG Cowen on November 14, 2005.  Interrogatory Number 8 asked

that Twin City identify all facts upon which it relied in asserting each of its Affirmative

Defenses.  In its response to this Interrogatory, Twin City continued to assert that the

NY-406494 v1

Complaint had to be dismissed, as stated in the Answer, because SG Cowen did not sue for

Defense Costs and was only suing to recover the unpaid portion of the Settlement Amount:

> The claim asserted in SG Cowen's Complaint is barred by the
> Agreement and Conditional Claim Release. **That Release bars
> all claims** under the Policy arising out of the Baker Litigation,
> **with the sole exception of Defense Costs** and other Claims
> Expenses. Furthermore, Twin City has satisfied its obligations
> under the Release by paying $7,500,000 toward the funding of
> the settlement of the Baker Litigation, and by agreeing to
> preserve SG Cowen's right to seek full recovery of the "Defense
> Costs and other Claims Expenses" incurred in the court of the
> Baker Litigation.
>
> **Because the Complaint seeks only a portion of the settlement
> amount** for the Baker Litigation **and not Defense Costs** and
> Claims Expenses, as agreed by the parties in the Agreement and
> Conditional Release, **the claim asserted by the Complaint is
> barred by the Release as a matter of law**. (Emphasis added)

**Twin City Suddenly Pays SG Cowen**
**$1.4 Million Of The Unpaid Settlement Amount**

54.     Butler's deposition was scheduled for Monday, November 28, 2005. On

November 22, 2005, Butler put in instructions at Twin City for the issuance of a check

payable to SG Cowen in the amount of $1,444,606.14, the amount that he admittedly had

determined, at least a "couple of months" earlier, that Twin City owed to SG Cowen. (See ¶

61 below) The check was issued and dated the next day, and mailed to SG Cowen's counsel

in this action, along with Butler's transmittal letter dated November 22, 2005. This payment

was made without any prior notice to SG Cowen.

55.     Still adhering to the "party line," Butler's transmittal letter stated that the

check was "reimbursement of defense costs" for the Baker Claim. Thus, as late as

November 23, 2005, Twin City was still adhering to the position, adopted in its Answer, and thereafter asserted in all of Twin City's Court filings, that SG Cowen had no right to sue for the unpaid portion of the Settlement, but could only sue for Defense Costs which, as Twin City had previously pointed out in its Answer (Answer ¶ 18; Counterclaim, ¶ 3), and Butler acknowledged in his deposition, had all been paid by the Underlying Insurance.

56.     Butler finally abandoned the party line, however, when he was questioned at his deposition.

**The Litigation Strategy
Unravels; The Truth Begins To
Emerge At Butler's Deposition**

57.     During his deposition, Butler made a number of admissions that were devastating to Twin City's litigation strategy and the position it had taken in its filings in this action.

58.     First, Butler contradicted Twin City's basic position in this litigation, namely that the parties did not intend to preserve SG Cowen's right to sue for the unpaid portion of the Settlement, but rather only for Defense Costs.  In line with SG Cowen's position, Butler admitted that the parties' basic approach in negotiating the Release was to preserve the right to sue for the unpaid portion of the Settlement.  Butler testified as follows:

> Q.    [Referring to a Butler email of March 16, 2005 stating that]
> "[W]e would be willing to fund an undisputed amount at
> this time   with SG Cowen funding the balance."  And that
> was the approach you finally took?
>
> A.    Yes.

21

> Q. And then it [your email] said, "We could then continue to address these issues." The issues you were referring to here were the issues relating to how much Twin City would contribute toward the settlement; were they not?
>
> A. It would be how much we would be paying under the policy.
>
> Q. Toward the settlement?
>
> [Twin City Counsel]:          Objection.
>
> A. To reimburse SG Cowen.
>
> Q. For the settlement?
>
> A. For the amount that they put out, yes.
>
> Q. To pay the settlement; correct?
>
> A. Yes.
>     (Transcript, 233:12-234:7)

Butler also conceded that this approach was ultimately embodied in the Release:

> Q. Now under the terms of the release, do you understand that SG Cowen has the right to seek from Twin City all or a portion of the $[6.8] million that it had to advance to fund the settlement?
>
> A. Yes.
>     (Transcript, 16:25-17:6)

59.     In this very regard, Butler admitted that the $1.4 million check that he had just authorized was in response to the Complaint's demand for reimbursement of the unpaid Settlement amount:

> Q. Did you understand that SG Cowen was seeking [in the Complaint] to recover some part of the amount that it had paid to settle the Baker litigation?
>
> A. Yes.

22

> Q.   .… And … as recently as last Wednesday [November 23] Twin City recognized its obligation to pay approximately $1.4 million to reimburse … SG Cowen, for some of the amount it paid to settle the Baker litigation; correct?
>
> A.   Yes.
>
> Q.   So in response to the demand in the complaint, Twin City has now paid $1.4 million; correct?
>
> [Counsel for Twin City]:  Objection.
>
> A.   We've paid $1.4 million because we determined that those expenses were reasonable.
>
> **Q.   You understood that the $1.4 million was part of the amount that is being sought to be recovered in the complaint that was filed against Twin City; correct?**
>
> **A.   I would imagine that is, yes.**
> (Transcript, 58:3-24) (Emphasis added)

60.     Second, Butler's admission that this $1.4 million was owed pursuant to the terms of the Release necessarily demolished Twin City's Second Defense, which alleged that SG Cowen's right to recover from Twin City was defeated by the fact that all of the Defense Costs had already been paid.

61.     Third, Butler admitted that Twin City held on to the $1.4 million well after he had determined that it was owed to SG Cowen.  Butler professed not to recall when Twin City had finished reviewing the remaining group of invoices for those previously-paid Defense Costs which were not part of the March 2005 Audit, and which were obtained by Twin City following the execution of the Release.  Although refusing to commit himself to any particular time, Butler did admit that it was "possible" that Twin City had finished an alleged "audit" of all these invoices as early as May 2005, some six months before the

23

money was paid.  (Transcript, 40:5-9; 52:18-53:8)  Assuming this were the case, Twin City should have paid SG Cowen the $1.4 million no later than shortly after its Complaint was filed at the end of May.  Butler further testified that his decision that SG Cowen should be paid this additional $1.4 million was "probably" made "within the last few months" or a "couple of months" ago.  (Transcript, 43:7-15)  Butler acknowledged that there was no reason why, if the decision were made a "couple of months" ago, the check could not have been issued within a day.  (Transcript, 52:18-53:15)  Butler also offered no reason why Twin City held on to SG Cowen's money until the time of Butler's deposition, and Butler denied that there was any connection between the nearly simultaneous dates of payment and his deposition.  (Transcript, 47:6-48:2)

62.     Fourth, Butler's admission that Twin City owed SG Cowen at least $1.4 million, part of the amount sued for in the Complaint, demonstrated the bad faith nature of Twin City's Counterclaim, which alleged that the filing of the Complaint constituted a breach of SG Cowen's obligations under the Release.

63.     Notwithstanding all the foregoing admissions, Butler still sought to somehow justify Twin City's delay in paying the $1.4 million, by telling a story about the internal Twin City "audit" that supposedly caused this delay.

64.     Butler had originally told SG Cowen, when the Settlement was being finalized in late March/early April 2005 that he was holding back the additional $1.4 million so that Twin City would have time to audit for reasonableness the invoices for previously-paid Defense Costs that had not been part of the March Audit.

24

65.     Butler was asked, during his deposition, whether any such audit was ever done.  Butler initially replied that there was such an "audit," and that it had been performed by unidentified "[p]eople" within Twin City who were Claims Consultants.  (Transcript, 34:15-35:23)  Butler responded, when asked if he was sure that he relied upon this audit, that "I believe so," and "I assume I relied on the results of the audit in determining that payment should be made." (Transcript, 41:24-43:3)  On the other hand, Butler stated that he could not recall ever getting the results of the audit and could not remember what the results of the audit were.  (Transcript, 40:10-43:6)  According to Butler: he could not remember who he asked to perform the audit, when or how he made the request, when the audit began, who did the audit, how long it took, when the audit was completed (although admitting it was possible that it was as early as May 2005), or how he got the results of the audit (orally or in writing). (Transcript, 149:24-150:13; 40:16-41:17)

66.     SG Cowen's counsel pressed Butler and asked if he could give the names of people at Twin City who could be questioned to find out if any audit had actually been done, and if so the details about it.   Butler testified that he knew of no one else in the company who knew about the audit, and that he did not believe that there was any written record of the audit anywhere in Twin City's files, including the Baker Claim File, where it ordinarily would be if it had been done.  (Transcript, 193:11-196:10; 197:6-8)

67.     When SG Cowen's counsel continued pressing Butler for "leads" to solve the mystery of who did this alleged audit, Butler appeared to completely reverse himself.  Butler now testified that no one else might know about this "audit" because it was Butler who did it:

25

> Q. …. I'm trying to find out who is the person that did the audit you told us about. You don't know the name. So my questions are designed to find out is there someone that is likely because they do audits generally or they have done audits. I just want a lead, that's all.
>
> A. I've done audits.
>
> Q. But we know you didn't do this audit.
>
> A. I'm not certain of that.
>
> Q. Oh, you're not certain? You think you might have done the audit?
>
> A. It's possible.
> (Transcript, 199:22-200:11)

**Twin City Responds By Partially
Changing Its Interpretation Of The Release**

68.    On December 2, 2005, within days of the Butler deposition, Twin City filed a motion for leave to amend its Answer And Counterclaim.

69.    As previously stated, in its original Answer Twin City had alleged that the Release reserved to SG Cowen only the right to sue for Defense Costs, and added that all the Defense Costs had already been paid, so SG Cowen's Complaint had to be dismissed. (See ¶¶ 38-41 above) Under Twin City's new interpretation, it still insists that the Release only preserved the right to sue for Defense Costs – not the unpaid portion of the Settlement. What is new, however, is Twin City's abandonment of its earlier contention that the prior payment by the Underlying Insurers of Defense Costs defeated any claim by SG Cowen. Under Twin City's new interpretation of the Release, it makes no difference if such payment occurred – the Release was supposedly intended to authorize SG Cowen to sue Twin City to recover

26

these very same Defense Costs a second time.  (Amended Answer, ¶ 18, ¶ 24 Counterclaim, ¶ 3)

**Twin City's Revised Interpretation**
**Is Still In Furtherance Of**
**Its Original Litigation Strategy**

70.    Following Butler's deposition, in its Amended Answer Twin City continues to assert the very same position and to follow much the same basic litigation strategy that has guided its actions in this lawsuit up to the present.  Butler conceded that SG Cowen had the right under the Release to sue for the unpaid Settlement amount, and that at least $1.4 million of the amount sued for was owed.  Nevertheless, the Amended Answer still insists that the claims in the Complaint seeking the unpaid Settlement amount are barred, as a matter of law, by the terms of the Release.  (Amended Answer, ¶¶18-20, 24)  Further, the Amended Answer still asserts that there was a "full accord and satisfaction … with respect to the claims asserted in the Plaintiff's Complaint."  (Amended Answer, ¶ 25)   The Amended Counterclaim also continues to allege that, because the "Complaint fails to seek recovery for the aforesaid Defense Costs," SG Cowen has breached the Release by asserting "claims which are barred by the Release," thereby entitling Twin City to money damages.  (Amended Counterclaim, ¶¶ 3-4, and Wherefore Clause, (a))  In sum, Twin City continues to assert much the very same position and to follow the same basic litigation strategy that has thus far guided its actions in this lawsuit, even though Twin City's basic position is inconsistent with the testimony of the Twin City representative who negotiated the Release.

**Count I**
**(Breach Of Contract And Declaratory Judgment For $1,444,606.14)**

71.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-70 above.

72.     Twin City has admitted that it owed SG Cowen an additional $1,444,606.14 towards the Settlement.  There presently exists an actual controversy with respect to whether Twin City owed SG Cowen the additional $1,444,606.14 towards the Settlement as of April 8, 2005.  Hence, this Court has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.  It is SG Cowen's position that under the terms of the Policy, Twin City was required to pay SG Cowen, on April 8, 2005, the $1,444,606.14 that Twin City did not pay until November 28, 2005.

WHEREFORE, Plaintiff demands judgment on Count I:

(a)     declaring that Twin City breached its contractual obligations under the Policy by failing to pay the $1,444,606.14 when due, on April 8, 2005;

(b)     awarding prejudgment interest at 12%, pursuant to M.G.L. ch. 231 sec. 6C, commencing on April 8, 2005 and ending on November 29, 2005; and

(c)     awarding such other and further relief as to which Plaintiff may be entitled.

NY-406494 v1

## Count II
## (Breach Of Contract For $5,411,237.35)

73.     Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1-70 above.

74.     Under the terms of the Policy, Twin City was required to pay SG Cowen, on

April 8, 2005, an additional sum of $5,411,237.35 towards the funding of the Settlement,

which Twin City has failed and refused to do up until the present.

WHEREFORE, Plaintiff demands judgment on Count II:

(a)     awarding damages in the amount of $5,411,237.35;

(b)     awarding prejudgment interest at 12%, pursuant to M.G.L. ch. 231 sec. 6C,

commencing on April 8, 2005; and

(c)     awarding such other and further relief as to which Plaintiff may be entitled.

## Count III
## (Breach of the Implied Covenant of Good Faith and Fair Dealing For $6,858,843.49)

75.     Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1-70 above.

76.     Twin City owes to SG Cowen, its insured, a duty of good faith and fair dealing

under the Policy and at law.

29

NY-406494 v1

77.     Twin City has breached its duty of good faith and fair dealing to SG Cowen by, among other things, (a) repudiating in bad faith its obligation under the Twin City Policy to fund its full portion of the Settlement Payment, and (b) by engaging in the other acts and practices previously alleged herein.

78.     As a direct and proximate result of Twin City's breach of the implied covenant of good faith and fair dealing, SG Cowen has suffered and continues to suffer damages.

WHEREFORE, Plaintiff demands judgment on Count III:

(a)     awarding damages in the amount of $6,855,843.49 (but allowing Twin City a credit for the $1,444,606.14 it previously paid);

(b)     awarding prejudgment interest at 12%, pursuant to M.G.L. ch. 231 sec. 6C, commencing on April 8, 2005; and

(c)     awarding such other and further relief as to which Plaintiff may be entitled.

### Count IV
### Violation Of Chapter 93A
### <u>(With Respect To The $6,858,843.49)</u>

79.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-70 above.

80.     Twin City and SG Cowen are engaged in trade or commerce within the meaning of M.G.L. ch. 93A §§ 1(a), (b) and 11.

30

81. The claims and contentions made by Twin City in connection with its handling of SG Cowen's insurance claim are frivolous, wholly unsubstantiated, without basis and known by Twin City to be such, including the claims made (a) in Twin City's original Answer, (b) in its Rule 16.1 Statement of the Case, (c) during the October 5, 2005, Rule 16 Scheduling Conference, (d) in its Motion For A Protective Order, (e) in its Answers To Interrogatories, (f) in the Butler deposition, and (g) in its Amended Answer and Counterclaim.

82. The position taken by Twin City that it did not owe SG Cowen at least $1,444,606.14, as sued for in the Complaint, reflects an utter disdain for Twin City's contractual obligations to SG Cowen and Twin City's duty of good faith and fair dealing toward an insured.

83. The Counterclaim's demand that SG Cowen pay Twin City's damages (by way of Twin City's attorneys' fees and expenses) incurred, in part, in seeking to defeat SG Cowen's Complaint attempting to recover this $1.4 million concededly owed by Twin City, constitutes a bad faith attempt to coerce SG Cowen into accepting less than the amount to which it is entitled from Twin City.

84. Twin City's conduct was in disregard of its known contractual obligations to SG Cowen and was intended to secure benefits for Twin City to which it was not entitled, and to gain an unfair advantage over SG Cowen.

85. Twin City's conduct generally was intended to gain leverage for Twin City and to assist it in extracting a favorable settlement from SG Cowen for less than the amount

31

Twin City knew that it was obligated to pay to SG Cowen, and to persuade SG Cowen to not insist upon payment of all the insurance proceeds to which it was entitled.

86.     The acts and practices described above that Twin City engaged in as part of its handling of SG Cowen's claim constitute unfair and deceptive claims settlement acts and practices within the meaning of M.G.L. ch. 176D § 3(9)(b), (d), (f), and (g) regulating the conduct of insurers in handling claims.

87.     The activities described above constitute "deceptive acts and practices" within the meaning of M.G.L. ch. 93A §§ 2 and 11, and they occurred "primarily and substantially" within the Commonwealth of Massachusetts.

88.     As a direct and proximate result of such unfair and deceptive acts and practices, SG Cowen has suffered and continues to suffer damages in an amount to be determined at trial.

89.     Twin City's conduct has been in knowing and willful violation of Chapter 93A, and as a result, SG Cowen is entitled to treble damages and reasonable attorneys' fees pursuant to M.G.L. ch. 93A § 11.

WHEREFORE, Plaintiff demands judgment on Count IV:

(a)     awarding Plaintiff actual damages as a result of the deceptive acts and practices of Twin City, such damages consisting of (i) $1,444.606.14, plus (ii) such portion of the $5,411,237.35 that the Court determines to have been wrongfully withheld by Twin City, and (iii) the lost use of the funds referred to in (i) and (ii);

NY-406494 v1

(b)     tripling the actual damages sustained (referred to in (a) above) because Twin City acted knowingly and willfully in violation of M.G.L. ch. 93A § 11, and thereafter deducting as a credit from that tripled damage amount the $1,444,606.14 that Twin City has previously paid to SG Cowen;

(c)     awarding Plaintiff's reasonable attorneys' fees and costs related to this action; and

(d)     awarding such other and further relief as to which Plaintiff may be entitled.

SG Cowen & Co., LLC,
By its attorneys,

/s/ Aimée E. Bierman
Wm. Shaw McDermott (BBO #330860)
    (wmcdermott@klng.com)
Aimée E. Bierman (BBO #640385)
    (abierman@klng.com)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
75 State Street
Boston, MA  02109-1808
(617) 261-3100

Gerald A. Novack, Esq. (admitted *pro hac vice*)
Jessica L. Jiménez, Esq. (admitted *pro hac vice*)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
599 Lexington Ave.
New York, NY  10022
(212) 536-3900

Dated:  December 19, 2005

33