**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SG COWEN & CO., LLC,** Plaintiff, -against- **TWIN CITY FIRE INSURANCE COMPANY,** Defendant. | **Civil Action No. 05-11106-PBS** **SECOND SUPPLEMENTAL DECLARATION OF GERALD A. NOVACK, ESQ.** |

Gerald A. Novack, hereby states as follows:

1. I am a member of the firm of Kirkpatrick & Lockhart Nicholson Graham LLP, attorneys for the Plaintiff SG Cowen & Co., LLC ("SG Cowen"). I respectfully submit this Second Supplemental Declaration in further opposition to the motion by Defendant Twin City Fire Insurance Company ("Twin City") for a protective order barring discovery of extrinsic or parol evidence relating to the meaning of the Agreement and Conditional Claim Release entered into between SG Cowen and Twin City on April 6, 2005 (the "Release"). I submit this Supplemental Declaration to bring to the Court's attention two events that occurred yesterday, November 28, 2005, which bear upon the existing motion for a protective order and demonstrate that Twin City's motion is not

only meritless but also not brought in good faith. Those events are: (1) the admissions made by Twin City's representative, Christopher Butler, at his deposition Monday; and (2) the receipt on Monday by SG Cowen of a check from Twin City for approximately $1.4 million, in partial satisfaction of the claim asserted in the Complaint.

2. Twin City's motion for a protective order (like its Answer with Counterclaim) takes the (unsworn) position that, under the supposedly unambiguous terms of the Release, SG Cowen released any right to sue Twin City for the $6.85 million portion of the Baker litigation settlement that Twin City refused to pay. According to Twin City, the only right that SG Cowen reserved was to sue Twin City to recover Defense Costs (almost all of which had already been paid!) by the underlying insurance.

3. At his deposition taken yesterday, Christopher Butler, who negotiated the Release on Twin City's behalf, admitted that SG Cowen had indeed reserved the right to sue to recover that portion of the settlement amount that Twin City was unwilling to pay. (Attached as Exhibit A hereto are excerpts from that deposition. See discussion below, in ¶¶ 6 - 8)

4. Mr. Butler's deposition testimony directly contradicts Twin City's reading of the Release and certainly refutes any contention that the Release is so clear and unambiguous that it can only be read as barring the claim asserted by SG Cowen in the Complaint.

5. During the course of his deposition Mr. Butler disclosed that, on the prior Wednesday, November 23, 2005, he had mailed to SG Cowen's counsel a Twin City

check in the amount of $1,444,606.14, payable to SG Cowen. * (Attached as Exhibit B hereto is a copy of the Mr. Butler's letter and the accompanying check.) During his deposition, Mr. Butler testified about the Release and this check.

6. Mr. Butler conceded that the approach agreed upon during the negotiation of the Release was to have Twin City pay (on a non-refundable basis) $7.5 million towards the settlement, with SG Cowen advancing the balance needed to completely fund the settlement amount (an additional $6.85 million approximately), with the understanding that the parties would reserve the right to later address the issues arising from Twin City's refusal to pay more at the time. (Exhibit A, 231:8-22, 233:11 – 234:7) Mr. Butler also admitted that, in line with this approach, the Release as executed did reserve to SG Cowen the right to sue Twin City for the approximately $6.85 million it refused to pay toward the settlement amount.

7. Thus, Mr. Butler testified that "under the terms of the release … SG Cowen has the right to seek … the $6.9 million that it had to advance to fund the settlement:" **

> Q. On the day that the settlement was being funded [on April 8, 2005], it turned out that SG Cowen only had

* At the time of the Release, Twin City had obtained an Audit concluding that approximately $5.4 million of Defense Costs were unreasonable. Twin City nevertheless withheld approximately $6.85 million, or approximately $1.44 million more than this Audit would purportedly justify. This recent $1.44 million payment reflects Twin City's concession that there was no basis for it to withhold this $1.44 million.

** During the deposition, as a shorthand reference, the $6.85 million was sometimes referred to as approximately $6.9 million.

to advance approximately $6.9 million, not the 7.4 that was referred to in the release; correct?

A. I believe so.

Q. Now **under the terms of the release**, do you understand that **SG Cowen has the right to seek** from Twin City all or a portion of **the $6.9 million that it had to advance to fund the settlement?**

A. **Yes.**
(Exhibit A, 16:19 – 17:6) (Emphasis added)

8. Moreover, Mr. Butler also admitted that the approximately $1.4 million that Twin City had just paid SG Cowen "was part of the amount that is being sought to be recovered in the complaint that was filed against Twin City:"

Q. Let's go up to the first paragraph on page 8 [of Twin City's Answers to Interrogatories], about six lines down. It reads, "Pursuant to the agreement and release, a true copy of which is attached to this answer and counterclaim, the parties agreed to reserve their respective rights to dispute the reasonableness of the defense costs and depending on whether it was determined that the costs were or were not reasonable, SG Cowen's right to recover some or all of the amount it paid to settle the Baker litigation." That statement is true, correct?

A. That is correct.

Q. And under the release, SG Cowen reserved the right to recover, "some or all of the amount it paid to settle the Baker litigation"? That's true, isn't it?

A. Yes.

Q. You understood that the $1.4 million was a recovery of some part of the amount paid to settle the Baker litigation; did you not?

A. Yes.

Q. **Let's go to Butler Exhibit 3, the complaint.** I trust you saw that complaint sometime after it was filed, but before the deposition preparation; correct?

A. That is correct.

Q. Did you read the complaint carefully?

A. I believe so.

Q. **Did you understand that SG Cowen was seeking to recover some part of the amount that it had paid to settle the Baker litigation?**

A. **Yes.**

Q. **And recently, as recently as last Wednesday, Twin City recognized its obligation to pay approximately $1.4 million to reimburse it, meaning SG Cowen, for some of the amount it paid to settle the Baker litigation; correct?**

A. **Yes.**

Q. So in response to the demand in the complaint, Twin City has now paid $1.4 million; correct?

Mr. Stewart: Objection.

A. We've paid $1.4 million because we determined that those expenses were reasonable.

Q. **You understood that the $1.4 million was part of the amount that is being sought to be recovered in the complaint that was filed against Twin City; correct?**

A. **I would imagine that is, yes.**
(Exhibit A, 56:22 – 58:24) (Emphasis added)

9. It is respectfully submitted that this payment by Twin City, and these admissions by Mr. Butler, make it absolutely clear that there is no basis for the motion for a protective order.

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on November 29, 2005.

Gerald A. Novack

Gerald A. Novack, Esq.

# EXHIBIT A

Page 14

C. Butler

had no information as to whether they were paid or unpaid.

Q. But you have no information -- strike that. You had no information that you can now recall that there was any amount by way of defense costs that had not been paid at the time you signed the release; is that correct?

MR. STEWART: Objection. Asked and answered by this witness.

MR. NOVACK: You can answer it.

A. I'm assuming that there were some unpaid defense costs.

Q. I'm not asking you to assume. I'm asking you to tell me what you remember. Is it correct, as you sit here today, you cannot tell us that there was a dollar of defense costs that had been submitted that had not been paid by the underlying carriers at the time you signed the release?

MR. STEWART: Objection. Third time. Asked and answered.

MR. NOVACK: It was not answered. That's why I'm asking it again.

MR. STEWART: He answered it. You

Page 15

C. Butler

didn't like the answer that you got.

THE WITNESS: Could you repeat the question?

MR. NOVACK: I'll have her read it back.

(The record was read.)

A. As far as I recall, all defense costs that were submitted had been paid by somebody else.

Q. Would you look at the release, please, Butler Exhibit 1. Is it your understanding that there are any provisions in the release that permit SG Cowen to seek to recover from Twin City the unfunded portion of the settlement that Twin City refused to advance at the time the release was signed?

A. I'm not sure I understand the question.

Q. I'll break it down, then. At the time of the settlement being funded, Twin City paid $7.5 million pursuant to the terms of the release; correct?

A. That is correct.

Q. At the time the release was

Page 16

C. Butler

executed, SG Cowen advanced without prejudice, or it was anticipated it would advance without prejudice approximately $7.4 million to fund the settlement; correct?

A. Correct.

Q. You understood, once the settlement was funded, that in fact, the amount that SG Cowen had to advance was something less than $7.4 million, it eventually was around 6.9?

MR. STEWART: Objection. I think it's 7.5.

MR. NOVACK: Off the record.

THE VIDEO TECHNICIAN: We're going off the record. The time is 9:53.

(Discussion off the record.)

THE VIDEO TECHNICIAN: We're now back on the record. The time is 9:53.

Q. On the day that the settlement was being funded, it turned out that SG Cowen only had to advance approximately $6.9 million, not the 7.4 that was referred to in the release; correct?

A. I believe so.

Q. Now under the terms of the release,

Page 17

C. Butler

do you understand that SG Cowen has the right to seek from Twin City all or a portion of the $6.9 million that it had to advance to fund the settlement?

A. Yes.

Q. Can you tell me what provision or provisions in the release relate to that answer?

A. On page 2, in the whereas, "Twin City and SG dispute whether coverage is available under the Twin City policy, in whole or in part, for the claims alleged in the Baker and Bamberg litigation and Twin City and SG dispute the reasonableness of the defense costs and other claims and expenses incurred therein."

Q. Let me just ask you, was SG Cowen disputing the reasonableness of the defense costs?

A. As far as I know, yes.

Q. SG Cowen was saying that the defense costs that had been paid that it had submitted were unreasonable?

A. No. They were saying they were reasonable.

Q. So they weren't disputing the

Case 1:05-cv-11106-PBS    Document 25-2    Filed 12/29/2005    Page 3 of 8

Page 54

C. Butler

than with vinegar.

MR. STEWART: Mr. Novack is reading my mind now.

Q. Let's go back to the interrogatories. We're done with that interlude.

A. Okay.

Q. Would you go to page 8, as your counsel suggests that I go. Can you go and look at the text that is on page 8 and follows over to page 9, and tell me if you disagree with anything that is stated in there? I presume you have read this before today, this answer to interrogatory?

A. That is correct.

Q. Based on having read it before today, and you can look at it again if you like, is there anything in there that you disagree with, that you believe may not be stated accurately?

A. No.

MR. STEWART: The witness has answered. I was going to ask him to take a moment to read through it.

MR. NOVACK: If he would like to. I presume he has read this carefully before.

Page 55

C. Butler

MR. STEWART: He has but --

Q. Would you like to look at it again for a minute?

A. Sure.

Q. Enjoy yourself.

A. Okay.

Q. I'd like to direct your attention to the second full paragraph on page 8. It reads, "The claim asserted in SG Cowen's complaint is barred by the agreement and conditional claim release. That release bars all claims under the policy arising out of the Baker litigation, with the sole exception of defense costs and other claims expenses. Furthermore, Twin City has satisfied its obligations under the release by paying $7,500,000 toward the funding of the settlement of the Baker litigation and by agreeing to preserve SG Cowen's right to seek full recovery of the defense costs and other claims expenses incurred in the course of the Baker litigation. Because the complaint seeks only a portion of the settlement amount for the Baker litigation, and not defense costs and claims expenses, as agreed by the parties in the

Page 56

C. Butler

agreement and conditional release, the claim asserted by the complaint is barred by the release as a matter of law."

Now, Twin City just paid $1.4 million toward the amount of the settlement that it had not previously funded; correct?

A. It paid the money based upon defense costs that were determined to be reasonable.

Q. What did you understand the $1.4 million was to cover? Was it to cover some portion of the amount paid to settle the Baker litigation?

A. I'm not sure I understand.

Q. Did you understand the $1.4 million was reimbursement to SG Cowen for some part of the amount that Cowen paid to settle the Baker litigation?

A. It was reimbursement for expenses that we determined were reasonable. I don't know what SG Cowen was using it for.

Q. Let's go up to the first paragraph on page 8, about six lines down. It reads, "Pursuant to the agreement and release, a true copy of which is attached to this answer and

Page 57

C. Butler

counterclaim, the parties agreed to reserve their respective rights to dispute the reasonableness of the defense costs and depending on whether it was determined that the costs were or were not reasonable, SG Cowen's right to recover some or all of the amount it paid to settle the Baker litigation." That statement is true, correct?

A. That is correct.

Q. And under the release, SG Cowen reserved the right to recover, "some or all of the amount it paid to settle the Baker litigation"? That's true, isn't it?

A. Yes.

Q. You understood that the $1.4 million was a recovery of some part of the amount paid to settle the Baker litigation; did you not?

A. Yes.

Q. Let's go to Butler Exhibit 3, the complaint. I trust you saw that complaint sometime after it was filed, but before the deposition preparation; correct?

A. That is correct.

Q. Did you read the complaint carefully?

C. Butler

A. I believe so.

Q. Did you understand that SG Cowen was seeking to recover some part of the amount that it had paid to settle the Baker litigation?

A. Yes.

Q. You understood -- withdrawn. And recently, as recently as last Wednesday, Twin City recognized its obligation to pay approximately $1.4 million to reimburse it, meaning SG Cowen, for some of the amount it paid to settle the Baker litigation; correct?

A. Yes.

Q. So in response to the demand in the complaint, Twin City has now paid $1.4 million; correct?

MR. STEWART: Objection.

A. We've paid $1.4 million because we determined that those expenses were reasonable.

Q. You understood that the $1.4 million was part of the amount that is being sought to be recovered in the complaint that was filed against Twin City; correct?

A. I would imagine that is, yes.

Q. Let's go to Butler Exhibit 4, the

C. Butler

answer and counterclaim. Do you have that in front of you?

A. Yes.

MR. NOVACK: Just as an aside, I'm not bothering with foundations at all because I know we have no dispute that these are in fact the operative documents here. If you have any questions along the way on something like this, just let me know and I'll be glad to authenticate it further. Let me just state that on the answer here, I don't believe I have attached an exhibit which was a copy of the release, so the answer and counterclaim which is Butler Exhibit 4 is the answer and counterclaim that is filed except that we don't have the attachment.

Q. Mr. Butler, did you look at the answer and counterclaim and review it before it was filed?

A. I don't remember.

Q. Did you have any practice with regard to reviewing documents that were filed by your counsel in connection with this lawsuit

C. Butler

before they were filed?

A. I would probably have reviewed some of them, yes.

Q. Did you provide any input into the -- without the substance, into the answer and counterclaim?

MR. STEWART: Just yes or no.

A. No.

Q. When you say no, do you mean that you didn't see the document and make any suggestions as to language, or what do you mean exactly? No input at all?

A. Not that I can recall, no.

Q. Did it come as a surprise to you that an answer and counterclaim had been filed?

A. No.

Q. Did you know one was being prepared?

A. I would imagine I did.

Q. You don't remember?

A. No.

Q. Do you remember seeing any draft of an answer and counterclaim before one was filed?

A. I don't remember.

Q. Did there ever come a time when you

C. Butler

reviewed the answer and counterclaim to see if you agreed with what was stated in it?

A. I don't recall.

Q. When is the first time you can remember looking at the answer and counterclaim?

A. I don't have any specific recollection.

Q. Do you have a general recollection?

A. No.

Q. The answer and counterclaim is dated August 5, 2005. Do you see that?

A. Yes.

Q. Do you recall whether or not you saw the answer and counterclaim in August 2005?

A. It's quite possible I did.

Q. When you looked at it, did you read it to see what it said?

MR. STEWART: Objection.

Q. Did you just look and say, "Oh, here's the answer and counterclaim," and file it or did you actually read it?

MR. STEWART: Objection.

A. I don't recall.

Q. When is the next time you saw the

Case 1:05-cv-11106-PBS    Document 37-3    Filed 12/29/2005    Page 6 of 8

Page 230

C. Butler

A. I don't.

Q. Do you recall anything general about any conversations you had with Mr. Kohlberger about the release?

A. I don't.

Q. Did you take any notes, even though you may not have them any longer, of any conversations that you may have had with either Mr. Zimmerman, Mr. Kohlberger or Mr. Morrison during the period January 2005 up until the time the release was signed?

A. Not that I recall.

Q. You don't recall taking any notes in any of those calls?

A. That is correct.

Q. Did you report to anybody at the Hartford on any of the conversations you had during the period January of 2005 up through the time the release was signed with respect to what the discussions were about the release? Other than saying, "Here's a release. Here's a document," or whatever, did you report to anyone in the Hartford on any discussions that you had with anyone at Skadden Arps about the terms of

Page 231

C. Butler

the release?

MR. STEWART: Objection. Asked and answered this morning.

Q. Was the answer no? If you remind me, then I'll --

A. The answer was no.

MR. NOVACK: Thank you for your help. Let's go to Butler Exhibit 23.

(Butler Exhibit 23, e-mail from Chris Butler to Peter Morrison at the top of the e-mail string and beneath it on the second page is an e-mail from Peter Morrison to Chris Butler, marked for identification.)

Q. It purports to be an e-mail from Chris Butler to Peter Morrison at the top of the e-mail string and beneath it on the second page is an e-mail from Peter Morrison to Chris Butler. Peter Morrison's to Butler is March 16, 2005 at 4:02, and Chris Butler's e-mail to Peter was at 2:07 that same day.

I can't tell, frankly -- the first e-mail says, "Peter, below is a list of some questions, the answers to which would be very

Page 232

C. Butler

helpful in working through these issues." Then at the bottom of the page, you say, "In order to expedite the settlement, we renew our offer to fund agreed upon portion of the settlement." Do you see that, the last paragraph?

A. Yes.

Q. "In order to expedite the settlement, we renew our offer to fund an agreed upon portion of the settlement subject to mutual reservation of rights with SG Cowen, pending resolution of these issues and our fee audit. Alternatively, we would be willing to fund an undisputed amount at this time with SG Cowen funding the balance. We could then continue to address these issues. Let me know your thoughts." Look at the language I just quoted, "We renew our offer to fund an agreed upon portion of the settlement subject to the mutual reservation of rights." You were talking about paying some amount toward the settlement, and reserving your rights with respect to whether an additional amount toward the settlement had to be paid; is that not right?

A. Well, no -- I'm not sure.

Page 233

C. Butler

Q. Explain to me what makes you unsure.

A. Reading this, it could be read to be that we would be funding an agreed upon portion, and the reservation of rights would be mutual, so that either we could then contend that we should be reimbursed for some portion of what we paid or SG Cowen could contend that they should be -- that they would be entitled to additional payment.

Q. I see. Then you say, "Alternatively, we would be willing to fund an undisputed amount at this time with SG Cowen funding the balance." And that was the approach you finally took?

A. Yes.

Q. And then it said, "We could then continue to address these issues." The issues you were referring to here were the issues relating to how much Twin City would contribute toward the settlement; were they not?

A. It would be how much we would be paying under the policy.

Q. Toward the settlement?

MR. STEWART: Objection.

C. Butler

A. To reimburse SG Cowen.
Q. For the settlement?
A. For the amount that they put out, yes.
Q. To pay the settlement; correct?
A. Yes.
(Butler Exhibit 24, string of e-mails, marked for identification.)
Q. Let's go to Butler Exhibit 24. This purports to be an e-mail or a string of e-mails. You can take a look at them. I'm interested in the top page, Peter Morrison to you, March 16th.
Did you receive this on or about the 16th of March as best you can tell?
A. I don't specifically recall, but I have no reason to think I didn't.
Q. And we see that there's information about the amount that has been paid by the underlying insurers in respect of either other claims or toward the defense costs in connection with this claim; correct?
A. Correct.
Q. You were aware that the underlying insurers' policies were being eroded or perhaps

C. Butler

exhausted by payment of these defense costs as well as the other claim; correct?
A. As well as this particular claim.
Q. And you see that Mr. Morrison asks you for a release, a form of release for the next day. That would be the 17th of March.
Do you recall any conversation with him on or around the 16th about that release or all you can recall is that you were getting these e-mails?
A. I don't recall any conversation.
MR. NOVACK: Let's go to Butler Exhibit 25.
(Butler Exhibit 25, e-mail from Anthony Hernandez to Christopher Butler, marked for identification.)
MR. STEWART: Before we begin that, can we take a very short five minutes?
MR. NOVACK: Sure.
THE VIDEO TECHNICIAN: We're going off the record. The time is 3:38.
(Recess taken.)
THE VIDEO TECHNICIAN: We are now back on the record. The time is 3:42.

C. Butler

Q. Mr. Butler, we just had an off the record break. Is there any testimony you want to change?
A. No.
Q. Good. We're up to 25, Butler Exhibit 25 now. That's the last one you have in front of you.
A. Yes.
Q. Butler Exhibit 25 appears to be an e-mail from Mr. Hernandez to you, referring to a conference call. The question is, was Brian Beale still involved in the picture as of March 17, 2005?
A. I don't believe so.
MR. NOVACK: Let's go to March 18, Butler Exhibit 26.
(Butler Exhibit 26, March 18 e-mail to Christopher Butler from Patricia Dee Bilka, marked for identification.)
Q. It appears to be an e-mail to you from Patricia Dee Bilka. Do you recall receiving that e-mail from her on or around that date?
A. No.
Q. Do you have some reason to think you

C. Butler

didn't get it?
A. No.
Q. Generally speaking, do you recall that your e-mail system was in working order during the first half of 2005?
A. Yes.
Q. So if someone had the right e-mail address, they probably would get through to you?
A. Yes.
Q. Thanks. You see the e-mail at the bottom of that page, which is at 1:38 p.m. The one at the top of the page was at 10:54 a.m. It says, "I have spoken with AIG regarding the excess carriers' request for copies of the bills." Do you recall having a conversation with Annemarie Mazzone about getting copies of bills?
A. Generally.
Q. Basically, it was your effort during this period in March to see what the erosion had been on the underlying policies?
A. Yes.
MR. NOVACK: Let's go to Butler Exhibit 27.
(Butler Exhibit 27, March 16, 2005

# EXHIBIT B



THE HARTFORD

**Christopher J. Butler, Esq.**
Assistant Vice President
Telephone (212) 277-0476
Facsimile (917) 464-6456
chris.butler@thehartford.com

November 22, 2005

Jessica Jimenez, Esq.
Kirkpatrick & Lockhart
599 Lexington Avenue
New York, NY 10022

**RE: <u>Societe Generale- Baker</u>**

Dear Ms. Jimenez:

Enclosed is a check for $1,444,606.14 which is a reimbursement of defense costs for the referenced matter.

Please do not hesitate to call me if you have any questions.

Very truly yours,

C. Butler

Christopher J. Butler

Hartford Financial Products
2 Park Avenue
New York, NY 10016

Hartford Fire Insurance Company

**CHECK AMOUNT**

$ 1,444,606.14

PAYEE: SOCIETE GENERALE, NEW YORK

IN PAYMENT OF: REIMBURSEMENT FOR BAKER MATTER

INSURED: SOCIETE GENERALE, NEW YORK

CLAIMANT: BAKER, JANET ET AL

THE HARTFORD

| POLICY | CLAIM/CLMNT | PAY TYPE | EXAM | LOSS DATE | AMOUNT |
|---|---|---|---|---|---|
| NDF0130761 | 01281784 01 | J4 | 52000 | 06/06/01 | 1,444,606.14 |

For Check Information, please call 1(212) 277-0479.

CHECK NO. 93092073

Form T-258-7 Printed in U.S.A.

No. 9123847

THIS IS WATERMARKED PAPER - DO NOT ACCEPT WITHOUT NOTING WATERMARK - HOLD TO LIGHT TO VERIFY WATERMARK

VOID

THE HARTFORD

Fleet National Bank
150 Windsor St.
Hartford, CT 06120

51-44
119

NUMBER
93092073

| POLICY NUMBER | CLAIM NUMBER | CHECK DATE | AMOUNT |
|---|---|---|---|
| NDF0130761 | 01281784 | 11/23/05 | $*****1,444,606. |

HARTFORD FIRE INSURANCE COMPANY • Hartford, Connecticut 06

PAY TO THE ORDER OF SOCIETE GENERALE, NEW YORK

THE AMOUNT OF *ONE MILLION FOUR HUNDRED FORTY-FOUR THOUSAND SIX HUNDRED SIX DOLLARS AND 14/100*

JESSICA JIMENEZ, ESQ.
KIRKPATRICK & LOCKHART
599 LEXINGTON AVENUE
NEW YORK, NY 10022

Authorized Signature

⑈93092073⑈ ⑆011900445⑆ 4869⑈